### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| GERMAINS SEED TECHNOLOGY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 12-2737-CM |
| v. | ) ) | |
| R&R MANUFACTURING, INC. and PAUL GOERTZ, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM AND ORDER

The matter is before the court on defendants R&R Manufacturing, Inc. ("R&R") and Paul Goertz ("Goertz")'s motion to stay proceedings (Doc. 11). Plaintiff Germains Seed Technology, Inc. ("Germains") filed this diversity action against defendants, alleging breach of certain contractual obligations under a stock purchase agreement, unfair competition, and violations of the Kansas Uniform Trade Secret Act ("KUTSA") as a result of defendants' use of intellectual property and trade secrets acquired by Germains through a stock purchase agreement between the parties. Defendants argue that an arbitration clause contained in a separate agreement requires arbitration of plaintiff's claims. For the reasons stated below, the court denies defendants' motion.

### I.    Factual Background[1]

In either January or February of 2000,[2] Seed Systems, Inc. ("SSI") (now Germains) as buyer entered into a Stock Purchase Agreement ("SPA") with Lyle Silldorf, T. David Waldo, Kent Johnson, and Goertz ("sellers") as sellers. Under the SPA, SSI purchased all of the stock of Seed Technologies

---

[1]    The following facts are taken from the parties' briefs for the purposes of this motion.

[2]    The parties attach different versions of the Stock Purchase Agreement. One is dated January 26, 2000, and the other is dated February 20, 2000. Additionally, plaintiff states that the parties entered into the Stock Purchase Agreement on or about February 26, 2000.

Systems ("STS") from the sellers.  SSI also acquired all of STS's equipment drawings and processes, polymer formulas and formations, engineered technology systems, and trade secrets regarding STS's rotary coating machines and related equipment under the SPA.

On March 29, 2000, and June 15, 2000, Goertz, both individually and as the President of R&R, executed declarations ("the Declarations").  Through the Declarations, Goertz and R&R agreed they had no right, title, or interest to certain items listed on Schedule 3.28 of the SPA.  Goertz and R&R also agreed in the Declarations that they had no right to produce, manufacture, or sell any of the items identified in the Declarations or in Schedule 3.28 of the SPA without the written consent of STS (now also known as Germains).  Finally, under the Declarations, plaintiffs claim that Goertz and R&R "relinquished all rights, titles, and interests in or to any of the trade secrets, concepts, ideas, or other intellectual property rights relating in any way to STS's rotary coating machines." (Doc. 12 at 3.)

On May 31, 2000, STS entered into an Exclusive Supply Agreement ("ESA") with R&R, with Goertz executing the agreement as President of R&R.  Germains contends that the purpose of the ESA and the series of agreements that followed was to "enable R&R to manufacture and supply to STS/Germains certain products, including products which included the intellectual property and trade secrets acquired by Germains through the SPA." (Doc. 12 at 3.)  Defendants state that "[t]he ESA was an exclusive supply agreement in which R&R agreed not to sell or produce any of the products identified in the Agreement for any other party." (Doc. 11 at 2.)  The ESA contained an agreement that neither R&R nor STS/Germains was granting to the other party "any express or implied license to use any trademark, tradename, patent or proprietary information owned by" the other party. (Doc. 11-2 at 15.)  The ESA originally had a term of two years.  The parties then extended the ESA through May 31, 2006.

The ESA contained an arbitration clause, which provides, in relevant part:

-2-

Resolution of Disputes.  In the event of a dispute between MANUFACTURER and BUYER arising out of this Agreement which is not mutually resolved, the parties shall submit the dispute to binding arbitration . . . .

(Doc. 11-2 at 19.)

Effective June 1, 2006, and dated July 24, 2006, the parties entered into a one-year nonexclusive manufacturing agreement ("2006 Agreement").  The parties entered into another one-year nonexclusive manufacturing agreement on August 1, 2007, effective June 1, 2007 ("2007 Agreement"), which was substantively identical to the 2006 Agreement and again contained an arbitration clause.  On June 1, 2008, the parties entered into the first of four agreements (collectively the "Extension Agreements"), which extended the term of the 2007 Agreement through August 31, 2012.  The 2006 Agreement, the 2007 Agreement, and the Extension Agreements (collectively the "subsequent Agreements") contained the following arbitration clause, which provides, in relevant part:

In the event of a dispute between R&R and Germains arising out of this Agreement which is not mutually resolved, the parties shall submit the dispute to binding arbitration . . . .

(Docs. 11-3 at 4 and 11-4 at 4.)

On September 19, 2012, R&R notified Germains that it was terminating the agreement between the parties as of September 1, 2012, at the end of the 2012 Extension Agreement. Germains requested a six-month extension, but R&R declined.  Germains filed suit on November 19, 2012.

## II.      Discussion

Defendants contend that the instant action arose from R&R's refusal to continue to manufacture products for plaintiff.  Defendants argue that plaintiff's claims arise from the contractual relationships between the parties and that the arbitration clauses contained in the ESA, the 2006

Agreement, the 2007 Agreement, and the Extension Agreements (collectively the "Supply

Agreements") cover plaintiff's claims.  Defendants further argue that plaintiff intentionally avoided

citing to the Supply Agreements and disingenuously alleged claims only under the SPA and the

Declarations in an effort to avoid arbitration.

Plaintiff denies claiming that defendants violated any of the Supply Agreements.  Plaintiff

states that it is not claiming defendants cannot sell seed coating equipment for others based upon some

third party's plans and specifications, but instead claims that defendants are selling machines using

plaintiff's designs and intellectual property rights acquired through the SPA and Declarations.

The court acknowledges that it must look at the underlying facts of the complaint, and not

merely consider the labels attached to each of plaintiff's claims.  *See Chelsea Family Pharmacy,*

*PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1197–98 (10th Cir. 2009).  However, the court

finds that, based on the information available to the court, plaintiff's claims do not arise from any of

the obligations created by the Supply Agreements.  Plaintiff alleges neither a breach of defendants'

exclusive supply obligations under the ESA, nor a breach of the non-exclusive supply obligations

contained in the subsequent Agreements.  Instead, plaintiff alleges that defendants are selling

machines containing plaintiff's designs and intellectual property rights in breach of the SPA, and that

this action constitutes unfair competition, or in the alternative, violates the KUTSA.[3]

Section 3 of the Federal Arbitration Act states the following:

> If any suit or proceeding be brought in any of the courts of the United States upon any
> issue referable to arbitration under an agreement in writing for such arbitration, the
> court in which such suit is pending, upon being satisfied that the issue involved in such
> suit or proceeding is referable to arbitration under such an agreement, shall on
> application of one of the parties stay the trial of the action until such arbitration has

---

[3] Should plaintiff later seek leave to amend its complaint to include claims under the ESA or any of the subsequent
Agreements, defendants may again raise the issue of arbitrability of those claims at that time.  In addition, should
further discovery reveal that plaintiff's claims do in fact arise under the ESA or any of the subsequent Agreements, the
court may revisit the issue of arbitrability of those claims at that time.

been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

There is a strong policy favoring the enforcement of parties' agreements to arbitrate. *See Consol. Brokers Ins. Servs., Inc. v. Pan-Am. Assurance Co.*, 427 F. Supp. 2d 1074, 1081 (D. Kan. 2006); *see also Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (noting the national policy favoring arbitration declared by Section 2 of the Federal Arbitration Act) (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)). As a general rule, uncertainties regarding the scope of arbitration should weigh in favor of arbitration. *Id.* (citations omitted). But arbitration is governed by contract—a party cannot be compelled to enter into arbitration if it has not agreed to do so. *Id.* (citations omitted). Whether a dispute is subject to arbitration is for the court to determine, unless the parties "clearly and unmistakably provide otherwise." *Id.* (citations omitted).

"Although parties cannot be required to submit disputes to arbitration when they have not agreed to arbitrate those disputes, the Tenth Circuit has rejected the notion that disputes arising out of an agreement that lacks an arbitration clause are *ipso facto* not subject to the arbitration clause of a related contract." *Id.* (citations omitted). Thus, the fact that the SPA does not contain an arbitration clause does not foreclose the issue of whether the parties' dispute is subject to arbitration. The Tenth Circuit has found that broad language of an arbitration clause in one agreement can cover matters arising out of an agreement not containing an arbitration clause. *See, e.g.*, *ARW Exploration Corp v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995); *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1291–92 (10th Cir. 2004). The District of Kansas has similarly ruled. *See, e.g.*, *Armed Forces Ins. Corp. v. Allenbrook, Inc.*, No. 00-2435-GTV, 2001 WL 699735, at \*2–4 (D. Kan. June 11, 2001); *LDS, Inc. v. Metro Can. Logistics, Inc.*, 28 F. Supp. 2d 1297, 1303–04 (D. Kan. 1998).

The threshold issue in addressing a motion to compel arbitration is "whether an agreement to arbitrate exists and whether the agreement includes arbitration of the specific point at issue." *City of Wamego v. L.R. Foy Constr. Co.*, 675 P.2d 912, 915 (Kan. App. Ct. 1984).  In cases such as this one, where one agreement contains an arbitration clause and the other does not, courts first look to the breadth of the arbitration clause.  If the clause is broad enough to cover all disputes "related to" the agreement, the court next determines whether the agreements are "sufficiently related to justify compelling arbitration of all claims arising under the agreements." *Consol. Brokers*, 427 F. Supp. 2d at 1082.  In evaluating whether the agreements are "sufficiently related," courts consider the following factors: "(1) whether the agreements incorporate or reference each other; (2) whether the agreements are dependent on each other or relate to the same subject matter; (3) whether the arbitration clause specifically excludes certain claims; [and] (4) whether the agreements are executed closely in time and by the same parties." *Id*. (internal citations omitted).

It is undisputed that neither the SPA nor the Declarations contain an arbitration provision.  It is also undisputed that the Supply Agreements each do contain an arbitration clause.  To determine whether plaintiff's claims are subject to arbitration based on an arbitration clause in one or all of the Supply Agreements, the court will first analyze the breadth of the arbitration clauses in the agreements to determine whether the language is broad enough to cover all disputes between the parties.

Here, the arbitration clauses in the Supply Agreements both contain language requiring arbitration "[i]n the event of a dispute between [the parties] **arising out of this Agreement** which is not mutually resolved." (Docs. 11-2 at 19, 11-3 at 4, and 11-4 at 4 (emphasis added).)  When examining the arbitration clause in *Consolidated Brokers*, the court noted that first sentence addressed the parties' choice of law, and referred to disputes arising between the parties "under this Contract." 427 F. Supp. 2d at 1083.  The court contrasted that language with the arbitration provision language,

which stated that "any disputes between the parties shall be resolved by arbitration."  *Id.*  The court

noted that the arbitration clause contained no qualification that disputes must arise "under this

Contract" like in the first sentence covering the parties' choice of law.  *Id.*  Accordingly, the court

found that the arbitration clause was broad enough to extend to disputes arising under another contract

between the parties not containing an arbitration clause.

Likewise, in *ARW Exploration Corp.*, the Tenth Circuit found that arbitration clause language

contained in five agreements between the parties stating that all "disputes shall be subject to binding

arbitration" and that "[a]ny matter in dispute which is not provided for in this agreement" shall be

subject to arbitration was broad enough to cover disputes arising under a sixth agreement not

containing an arbitration clause.  45 F.3d at 1462.  Similarly, the Tenth Circuit in *SCOR Reinsurance*

found that language in one agreement requiring arbitration of "any irreconcilable dispute between the

parties to this Agreement" was sufficiently broad and applied to claims arising under another

agreement without an arbitration provision.  362 F.3d at 1290–92.

Other cases in this district have also hinged on the broad language of an arbitration clause.

*See, e.g.*, *Armed Forces Ins. Corp.*, 2001 WL 699735, at *2–4 (compelling arbitration based on

language in related agreement requiring arbitration for "any irreconcilable dispute between the parties

to this Agreement"); *LDS, Inc.*, 28 F. Supp. 2d at 1303–04 (finding broad language of arbitration

clause in one agreement stating that "any controversy or claim arising out of or relating to this

Agreement" mandated arbitration for a dispute arising under another agreement without an arbitration

clause).

Here, the court finds that the arbitration clause language contained in the Supply Agreements

is distinguishable from the broad language in the cases above.  The arbitration clause language stating

that disputes "arising out of this Agreement" are subject to arbitration is not broad enough to cover

plaintiff's claims brought under the SPA and the Declarations, which contain no arbitration clause. Unlike the cases above, which involve language such as "any disputes between the parties," "any matter in dispute which is not provided for in this agreement," "any irreconcilable dispute between the parties to this Agreement," or "any controversy or claim arising out of or relating to this Agreement," the language here cannot be read so broadly.

Further, the court finds that the language "arising out of this Agreement" is similar to the choice-of-law language used in the first sentence of the arbitration provision in *Consolidated Brokers*. There, the court focused on the distinction between the limitation of "under this Contract" in the choice-of-law language and the contrasting broad language of "any disputes between the parties" in the arbitration clause, in determining that the latter language was broad enough to cover disputes arising out of a related agreement. 427 F. Supp. 2d at 1083. The Tenth Circuit decisions above, as well as the decisions above from this district, depend heavily on the broad language in the arbitration clause in applying that language to claims arising under an agreement not containing an arbitration clause. Even while keeping in mind the strong policy favoring arbitration, the court finds that the language is not broad enough to cover plaintiff's claims under the SPA or the Declarations.

Moreover, even if the court were to find that the arbitration clause is broad enough to cover all disputes "related to" the agreement, the court is not convinced that the agreements are "sufficiently related to justify compelling arbitration of all claims arising under the agreements." *Consol. Brokers*, 427 F. Supp. 2d at 1082. Although the ESA does reference the SPA in certain places, the agreements are not dependent on each other. Nor do the agreements cover the same subject matter. The SPA and the Declarations involve the purchase of STS stock by SSI from the Sellers. In contrast, the ESA and the subsequent Agreements encompassed the exclusive (ESA) and non-exclusive (subsequent Agreements) nature of the arrangement between the parties through which R&R manufactured and

supplied various products to Germains.  Although there is no express exclusion of any of the issues

disputed here, the ESA does exclude claims for equitable relief from arbitration.  The ESA was

executed several months after the initial execution of the SPA, and the subsequent Agreements were

executed years after the SPA.  Finally, the parties to the SPA and the Declarations differ from the

parties to the Supply Agreements.

The arbitration clause language in the Supply Agreements is not broad enough to cover

plaintiff's claims, and even if it was, the agreements are not sufficiently related to cover plaintiff's

claims arising under the SPA and the Declarations.  Because plaintiff cannot be required to submit

claims to arbitration when it has not agreed to do so, the court denies defendants' motion to stay the

proceedings and compel arbitration.

**IT IS THEREFORE ORDERED** that Defendants Motion to Stay Proceedings (Doc. 11) is

denied.

Dated this 12th day of March,  2013, at Kansas City, Kansas.


**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**